

2013R00448/RA/SF

OCT 3 0 2018

AT 8:30_____M
WILLIAM T. WALSH, CLERK

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jose L. Linares |
| | : | |
| v. | : | Criminal No. 18- 655 |
| | : | |
| FRED DAIBES and | : | 18 U.S.C. §§ 371, 656, 982(a)(2), |
| MICHAEL MCMANUS | : | 1005, 1007, 1014, and 2 |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark,
charges:

### Count 1
### (Conspiracy)

### Defendants, Relevant Entities and Individuals

1.      At various times relevant to Count 1 of this Indictment:

        a.      Defendant FRED DAIBES ("DAIBES") resided in Edgewater,
New Jersey, and was the founder of Mariner's Bank.   From its inception until in
or about April 2011, DAIBES served as Chairman of the Board of Directors (the
"Board") of Mariner's Bank.   DAIBES also was the Chief Executive Officer of
Daibes Enterprises, which was a consortium of companies principally
specializing in real estate development, property management, contracting, and
financing.

        b.      Defendant MICHAEL MCMANUS ("MCMANUS") was the Chief
Financial Officer of Daibes Enterprises.   MCMANUS held himself out as owning

Washington Avenue Associates, LLC ("Washington Avenue Associates") and Carraroe D.G., LLC ("Carraroe").

      c.     Mariner's Bank was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"). Mariner's Bank was headquartered in Edgewater with branches located throughout Bergen County, New Jersey.

      d.     The FDIC was an independent agency created by Congress to maintain stability and public confidence in the nation's financial system by insuring deposits, examining and supervising banks for safety and soundness and consumer protection, and managing the resolution of banks placed in receivership for failure to comply with safety and soundness and other regulatory standards.

      e.     Nominee 1 was a friend and business associate of DAIBES.

      f.     Nominee 2 and Nominee 3 were relatives of Nominee 1.

      g.     Nominee 4 was a relative of DAIBES and the sole owner of 4400 North Federal Highway Associates, LLC ("4400 North Federal Highway").

      h.     Nominee 5 was a relative of DAIBES and the sole owner of 2571 Boggy Creek Associates, LLC ("2571 Boggy Creek").

      i.     Mariner's Bank was subject to federal and state banking regulations restricting the amount of bank funds that it could lend to a single borrower (the "Lending Limits").

      j.     Depending on the size and type of a requested loan, either the Board or the Loan Committee, a subset of the Board that included DAIBES,

voted to approve the loan.   Prior to voting on a proposed loan, the Board and the Loan Committee typically reviewed a loan memorandum prepared by a Mariner's Bank lending officer that set forth certain details about the proposed loan, including the borrowers, the terms, the collateral, the expected source of repayment, and the primary purpose of the loan proceeds.

   k. In or about 2011 and 2012, the FDIC conducted examinations of Mariner's Bank's lending practices, focusing specifically on direct and indirect loans to DAIBES and whether DAIBES had obtained loans in violation of the Lending Limits.

  2. From in or about January 2008 through in or about December 2013, DAIBES, MCMANUS, and others orchestrated a nominee loan scheme to circumvent the Lending Limits, in order to (a) obtain millions of dollars in loans from Mariner's Bank for the use and benefit of DAIBES and others and (b) conceal DAIBES' beneficial interests in the nominee loans from Mariner's Bank and the FDIC.

### The Conspiracy

  3. From in or about January 2008 through in or about December 2013, in Bergen County, in the District of New Jersey, and elsewhere, defendants

**FRED DAIBES and
MICHAEL MCMANUS**

knowingly and intentionally conspired and agreed with each other and others to commit offenses against the United States, that is:

a.     to embezzle, abstract, purloin, and willfully misapply, in amounts that well exceeded $1,000, moneys, funds and credits of Mariner's Bank, and moneys, funds, assets, and securities entrusted to the custody and care of Mariner's Bank, contrary to Title 18, United States Code, Section 656; and

b.     to make false entries in books, reports, and statements of Mariner's Bank, and to cause false entries in books, reports and statements of Mariner's Bank to be made, with the intent to defraud Mariner's Bank and to deceive an officer of Mariner's Bank, and the FDIC, and agents and examiners appointed to examine the affairs of Mariner's Bank, contrary to Title 18, United States Code, Section 1005.

## Object of the Conspiracy

4.     The object of the conspiracy was for DAIBES, MCMANUS, and others: (a) to circumvent the Lending Limits by using nominee borrowers to obtain millions of dollars in loans from Mariner's Bank for the benefit of DAIBES and others; and (b) to promote, facilitate, and conceal their misconduct by submitting false documents to Mariner's Bank and the FDIC and by causing false entries to be made in the books and records of Mariner's Bank.

## Manner and Means of the Conspiracy

5.     It was part of the conspiracy that:

a.     DAIBES and others recruited nominees, including Nominee 1, Nominee 2, Nominee 3, Nominee 4, Nominee 5, and MCMANUS (collectively, the

"Nominees") to obtain loans ("Nominee Loans") from Mariner's Bank for the benefit of DAIBES.

      b.    DAIBES, MCMANUS, and others, including the Nominees, made and caused to be made materially false and misleading statements and material omissions to Mariner's Bank in order to obtain the Nominee Loans, including by concealing that DAIBES was the true beneficiary of the Nominee Loans.

      c.    The Nominees, including MCMANUS, distributed or caused to be distributed the proceeds of the Nominee Loans to DAIBES.

      d.    DAIBES provided or caused to be provided to the Nominees the collateral used to secure certain of the Nominee Loans.

      e.    DAIBES provided or caused to be provided to the Nominees the funds to make monthly interest payments on the Nominee Loans.

      f.    DAIBES provided or caused to be provided to the Nominees the funds to pay off the principal on the Nominee Loans.

      g.    DAIBES and others caused Mariner's Bank to create and maintain documents falsely identifying the Nominees as the recipients of the Nominee Loans, when, in fact, DAIBES was the true beneficiary.

      h.    MCMANUS submitted and caused the submission of false and fraudulent documents to Mariner's Bank to make it appear that certain of the Nominee Loans were not, in fact, for the benefit of DAIBES.

i.      MCMANUS, DAIBES, and others submitted and caused the submission of false and fraudulent documents to conceal DAIBES' beneficial interest in certain of the Nominee Loans.

j.      DAIBES, with the assistance of MCMANUS, obtained, among others, the following nominee loans:

### I.      $1.8 Million Nominee Loan

i.      On or about June 11, 2008, the Loan Committee approved the extension of a $1.8 million line of credit to Nominee 1 ("$1.8 Million Nominee Loan").   According to the loan memorandum, the purpose of the loan was "real estate investment" and Nominee 1 purportedly requested the loan for "further real estate investments."   DAIBES voted to approve the loan.

ii.      Nominee 1 concealed from Mariner's Bank that the $1.8 Million Nominee Loan was for the benefit of DAIBES, that DAIBES would receive the proceeds of the loan, and that DAIBES would be responsible for repaying the loan.

iii.      On or about June 12, 2008, Mariner's Bank funded the $1.8 Million Nominee Loan by issuing a $1.8 million check to Nominee 1. Nominee 1 endorsed the check and gave it to DAIBES, who signed the check and caused it to be deposited into his own bank account in Fort Lee, New Jersey.

iv.      The Board renewed the $1.8 Million Loan on three occasions.   DAIBES voted in favor of renewal on one occasion and abstained from voting on two other occasions.

v.      Between in or about 2009 and in or about 2012, DAIBES issued checks to Nominee 1 in the approximate amounts of the monthly payments due and owing on the $1.8 Million Nominee Loan.   Nominee 1 utilized those funds to make loan payments to Mariner's Bank.   For example, on or about December 8, 2009, DAIBES caused a check to be written to Nominee 1 for $10,653.49.   On or about December 21, 2009, Nominee 1 caused this check to be deposited into Nominee 1's bank account.   And, on or about December 30, 2009, Nominee 1 caused a check to be written to Mariner's Bank in the amount of $10,653.49, the monthly payment due and owing on the $1.8 Million Nominee Loan.

vi.      In or about 2012, DAIBES utilized entities that he controlled to provide Nominee 1 with funds to pay the principal amount due and owing on the $1.8 Million Nominee Loan.

vii.      DAIBES did not disclose to Mariner's Bank that he was the beneficiary of the $1.8 Million Nominee Loan funds or that he was funding the interest and principal payments made by Nominee 1 to Mariner's Bank.

viii.      On or about December 22, 2011, MCMANUS created a contract, back-dated to on or about April 4, 2008, between DAIBES and Nominee 1 (the "Fake Contract").   The Fake Contract made it falsely appear as though DAIBES had agreed in or about April 2008 to sell to Nominee 1, for $1.8 million, his interest in a real estate venture.   On or about March 30, 2012, a representative of Mariner's Bank emailed the Fake Contract to the FDIC to

explain the reasons for the $1.8 Million Nominee Loan.   The representative then forwarded that email to DAIBES and MCMANUS.

    ix. On or about March 30, 2012, MCMANUS created a letter to DAIBES, from DAIBES' accountant (the "Accountant"), explaining the tax consequences of the Fake Contract.   The letter made it falsely appear as though the Accountant had evaluated the tax consequences of the Fake Contract.   MCMANUS sent the draft letter to the Accountant for the Accountant's signature.   DAIBES, MCMANUS, and others caused a representative of Mariner's Bank to disseminate the false information contained in the letter to the FDIC.   DAIBES, MCMANUS, and others created the Fake Contract and the letter from the Accountant to deceive the FDIC and to make it falsely appear as though the $1.8 Million Loan was not for DAIBES' benefit.

## II. The McManus Nominee Loan

    i. On or about August 5, 2008, MCMANUS signed and accepted a commitment letter from Mariner's Bank for a $1.65 million loan to Washington Avenue Associates (the "McManus Nominee Loan").   MCMANUS signed the commitment letter twice, first as the "sole managing member" of Washington Avenue Associates, and second as the guarantor for the loan.   The commitment letter falsely stated that the purpose of the loan was to "refinance 3 vacant, commercial properties for a return of equity."   In fact, MCMANUS concealed from Mariner's Bank that the loan was for the benefit of DAIBES.

    ii. According to the loan memorandum, dated on or about August 4, 2008, the McManus Nominee Loan was secured by a first mortgage

lien on three properties, and the primary source of repayment was a contract pursuant to which two of the three properties would be sold for approximately $2.15 million.   DAIBES had executed the contract on behalf of Washington Avenue Associates.   However, Mariner's Bank received a fraudulently altered copy of the contract on which DAIBES' name had been replaced with that of MCMANUS to make it falsely appear as though MCMANUS controlled Washington Avenue Associates and the collateral properties.

        iii.    On or about August 6, 2008, Mariner's Bank approved the McManus Nominee Loan.   That same day, the proceeds of the McManus Nominee Loan, approximately $1,518,750, were deposited into an attorney trust account and approximately $1,490,786 was subsequently transferred to Carraroe, a company owned and controlled by MCMANUS.   MCMANUS then transferred the funds from the Carraroe bank account to DAIBES.   The McManus Nominee Loan proceeds were not deposited into any Washington Avenue Associates accounts.

        iv.    DAIBES transferred most of the funds to businesses or bank accounts that he controlled.

        v.    DAIBES did not disclose to Mariner's Bank that he was the beneficiary of the funds from the McManus Nominee Loan.   DAIBES also did not disclose to Mariner's Bank that the sales contract submitted to Mariner's Bank that purportedly showed the primary source of repayment for the loan had been altered to falsely reflect MCMANUS's ownership of Washington Avenue Associates.

### III.   **The LCII Nominee Loan**

i.      On or about March 13, 2009, Mariner's Bank approved a $2.625 million loan to Nominee 2 and Nominee 3, on behalf of Liberty Commons II, LLC ("LCII") (the "LCII Nominee Loan").   According to the loan memorandum for the LCII Nominee Loan, the purpose of the loan was to "purchase all existing assets and ownership interests, including subject real estate, from current owner of Liberty Commons II, LLC."   The loan memorandum further listed Nominee 2 and Nominee 3 as the guarantors for the LCII Nominee Loan. In fact, the LCII Nominee Loan was for the benefit of DAIBES and Nominee 1, and neither Nominee 2 nor Nominee 3 expected to make any repayments towards it.

ii.     DAIBES and Nominee 1 had reached their Lending Limits.   Accordingly, Nominee 1 solicited Nominee 2 and Nominee 3 to obtain the LCII Nominee Loan for the benefit of DAIBES and Nominee 1.

iii.    In or about January 2009, DAIBES was the 100% owner of LCII.   In or about February 2009, Nominee 1 acquired a 100% ownership interest in LCII.   Later in or about February 2009, Nominee 1 entered into a contract to sell LCII to Nominee 2 and Nominee 3 for a purchase price of $3.5 million.

iv.     Nominee 2 and Nominee 3 represented to Mariner's Bank that they would use the $2.625 million in loan proceeds to pay Nominee 1 a portion of the $3.5 million purchase price. In fact, the contract was a sham, and Nominee 1 never collected the remaining monies owed.

v.     The funds from the LCII Nominee Loan were deposited into an attorney trust account and then transferred to DAIBES and Nominee 1. DAIBES used approximately $813,000 of the LCII Nominee Loan proceeds to purchase another bank branch in Park Ridge, New Jersey, that he subsequently leased back to Mariner's Bank.

vi.     In or about May 2010, DAIBES and Nominee 1 entered into a contract with a borough in New Jersey to build a police station on the property owned by LCII.   DAIBES and Nominee 1 signed the contract on behalf of LCII even though Nominee 2 and Nominee 3 were the supposed owners of LCII.

vii.     In or about December 2010, DAIBES and Nominee 1 obtained a construction loan from another financial institution that they used to partially pay down the principal on the LCII Nominee Loan.

viii.     In or about April 2013, DAIBES caused Mariner's Bank to issue a loan to a family trust that DAIBES controlled, and a portion of the loan proceeds were used to pay down the remaining principal on the LCII Nominee Loan.

ix.     Nominee 2 and Nominee 3 did not expend any of their own monies to obtain or pay down the LCII Nominee Loan.   Nominee 2 and Nominee 3 neither developed the property owned by LCII, nor communicated with the borough regarding the construction of a police station on that property.

x.     DAIBES did not disclose to Mariner's Bank that he was the beneficiary of a substantial portion of the funds from the LCII Nominee Loan.

## IV.   **The Nominee 4 Loan and the 4400 Nominee Loan**

i.      On or about August 28, 2009, DAIBES transferred and caused to be transferred approximately $2.6 million in stock collateral to Nominee 4.   Nominee 4 used the $2.6 million in collateral to apply for and receive a personal loan from Mariner's Bank for approximately $1.5 million (the "Nominee 4 Loan").

ii.      According to the loan memorandum, dated on or about September 1, 2009, Nominee 4 was listed as the borrower of the Nominee 4 Loan, when, in fact, the loan was for the benefit of DAIBES.

iii.      On or about September 1, 2009, at the direction of Nominee 4 and for the benefit of DAIBES, Mariner's Bank transferred the $1.5 million in loan proceeds to another bank ("Bank 1").   DAIBES utilized the $1.5 million to purchase a participation interest of an outstanding loan for a real estate construction project from Bank 1.

iv.      On or about December 11, 2009, DAIBES transferred three gas stations in Florida to 4400 North Federal Highway Associates for a nominal fee of $10 each.   Nominee 4 then refinanced the Nominee 4 Loan by substituting the three gas stations for the stock collateral and returning the stock collateral to DAIBES (the "4400 Nominee Loan").   The loan memorandum for the 4400 Nominee Loan, dated on or about December 16, 2009, stated that the rental income from the gas stations would serve as the primary source of repayment for the loan, when, in fact, DAIBES would and did fund the loan repayments.

12

v.      On or about December 21, 2009, MCMANUS signed and provided a false certification (the "False Certification") to the Mariner's Bank Board, attesting to the profitability of the three gas stations that had been transferred by DAIBES to 4400 North Federal Highway.   In the False Certification, MCMANUS stated that each of the gas stations had been paid monthly rent for at least the past 19 months and that each of the gas stations had been continuously used as a convenience store and gas station for at least the past five years.   Those statements were false.   The Board relied, in part, on the False Certification, to approve the 4400 Nominee Loan.

vi.      DAIBES transferred and caused to be transferred monthly payments to Nominee 4, who utilized those funds to make payments to Mariner's Bank for the 4400 Nominee Loan.   For instance, on or about March 2, 2010, DAIBES caused a $12,000 check to be written from DAIBES to Nominee 4.   On or about March 5, 2010, Nominee 4 caused a check to be written to Mariner's Bank for approximately $11,492, using the funds that had been provided by DAIBES, as a monthly interest payment on the 4400 Nominee Loan.

vii.      DAIBES did not disclose to Mariner's Bank that he was the beneficiary of the 4400 Nominee Loan funds or that he was funding the interest and principal payments made by Nominee 4 to Mariner's Bank.

**V.      The Nominee 5 Loan and the Boggy Creek Nominee Loan**

i.      On or about August 28, 2009, DAIBES transferred and caused to be transferred approximately $2.6 million in stock collateral to Nominee 5.   Nominee 5 used the $2.6 million in collateral to apply for and

receive a personal loan from Mariner's Bank for approximately $1.5 million (the "Nominee 5 Loan").

      ii.    According to the Mariner's Bank loan memorandum, dated on or about September 1, 2009, Nominee 5 was listed as the borrower of the Nominee 5 Loan, when, in fact, the loan was for the benefit of DAIBES.

      iii.    On or about September 1, 2009, at the direction of Nominee 5 and for the benefit of DAIBES, Mariner's Bank transferred the $1.5 million in loan proceeds to Bank 1.   DAIBES utilized the $1.5 million to purchase a participation interest of an outstanding loan for a real estate construction project from Bank 1.

      iv.    On or about December 11, 2009, DAIBES transferred three gas stations in Florida to 2571 Boggy Creek for a nominal fee of $10 each. Nominee 5 then refinanced the Nominee 5 Loan by substituting the three gas stations for the stock collateral and returning the stock collateral to DAIBES (the "Boggy Creek Nominee Loan").   The loan memorandum for the Boggy Creek Nominee Loan, dated on or about December 16, 2009, stated that the rental income from the gas stations would serve as the primary source of repayment for the loan, when, in fact, DAIBES would and did fund the loan repayments.

      v.    On or about December 21, 2009, MCMANUS signed and provided the False Certification to the Board, attesting to the profitability of the three gas stations that had been transferred by DAIBES to 2571 Boggy Creek. In the False Certification, MCMANUS falsely stated that each of the gas stations had been paid a monthly rent for at least the past 19 months and that each of

the gas stations had been continuously used as a convenience store and gas station for at least the past five years.   The Board relied, in part, on the False Certification, to approve the Boggy Creek Nominee Loan.

   vi. DAIBES transferred and caused to be transferred monthly payments to Nominee 5, who utilized those funds to make payments to Mariner's Bank for the Boggy Creek Nominee Loan.   For instance, on or about May 6, 2010, DAIBES caused an $11,500 check to be written from DAIBES to Nominee 5.   On or about May 10, 2010, a check was written to Mariner's Bank for approximately $11,492.82, utilizing the funds that had been provided by DAIBES, as a monthly interest payment on the Boggy Creek Nominee Loan.

   vii. DAIBES did not disclose to Mariner's Bank that he was the beneficiary of Boggy Creek Nominee Loan funds or that he was funding the interest and principal payments made by Nominee 5 to Mariner's Bank.

## **Overt Acts**

6. In furtherance of the conspiracy and to effect the conspiracy's objects, DAIBES, MCMANUS, and their co-conspirators committed and caused to be committed the following overt acts, among others, in the District of New Jersey and elsewhere:

   a. On or about June 12, 2008, DAIBES voted to approve the $1.8 Million Nominee Loan.

   b. On or about June 12, 2008, in Fort Lee, DAIBES deposited and caused to be deposited into his bank account a $1.8 million check from Mariner's Bank to Nominee 1.

15

c.    On or about August 5, 2008, MCMANUS signed the commitment letter for the McManus Nominee Loan, falsely stating that the purpose of the loan was to "refinance 3 vacant, commercial properties for a return of equity."

d.    On or about August 6, 2008, MCMANUS wired or caused to be wired approximately $1.49 million from Carraroe's bank account to an account controlled by DAIBES.

e.    On or about December 8, 2009, DAIBES caused a check to be written to Nominee 1 for $10,653.49.

f.    On or about March 13, 2009, in Edgewater, approximately $813,000 of the LCII Nominee Loan proceeds was wired from an attorney trust account to a bank account controlled by DAIBES.

g.    On or about September 1, 2009, in Edgewater, Mariner's Bank wired $1.5 million in proceeds from the Nominee 4 Loan to Bank 1, for the benefit of DAIBES.

h.    On or about December 11, 2009, DAIBES transferred three gas stations in Florida to 4400 North Federal Highway Associates for a nominal fee of $10 each.

i.    On or about September 1, 2009, in Edgewater, Mariner's Bank wired $1.5 million in proceeds from the Nominee 5 Loan to Bank 1, for the benefit of DAIBES.

j.    On or about December 11, 2009, DAIBES transferred three gas stations in Florida to 2571 Boggy Creek for a nominal fee of $10 each.

16

k.      On or about December 21, 2009, MCMANUS signed and provided the False Certification to the Board.

l.      On or about March 2, 2010, DAIBES caused a $12,000 check to be written from DAIBES to Nominee 4.

m.      On or about May 6, 2010, DAIBES caused a $11,500 check to be written from DAIBES to Nominee 5.

n.      On or about December 22, 2011, MCMANUS created the Fake Contract.

o.      On or about March 30, 2012, MCMANUS created a letter to DAIBES from the Accountant.

p.      On or about March 30, 2012, MCMANUS sent the draft letter to the Accountant for the Accountant's signature.

In violation of Title 18, United States Code, Section 371.

### Counts 2 to 6
### (Misapplication of Bank Funds)

1.     The allegations set forth in paragraphs 1, 2, 5 and 6 of Count 1 of this Indictment are realleged and incorporated herein.

2.     On or about the dates set forth below, at which time DAIBES was an officer, director, agent, employee of, and connected in a capacity with Mariner's Bank, in Bergen County, in the District of New Jersey, and elsewhere, the defendants set forth below did embezzle, abstract, purloin, and willfully misapply, in amounts that exceeded $1,000, moneys, funds, and credits of Mariner's Bank, and moneys, funds, assets, and securities entrusted to the custody and care of Mariner's Bank, and did aid, abet, counsel, command, induce, procure, and cause the same:

| Count | Defendant(s) | Approximate Date | Nominee Loan(s) | Approximate Amount of Nominee Loan |
|-------|--------------|------------------|-----------------|------------------------------------|
| 2 | FRED DAIBES and MICHAEL MCMANUS | June 11, 2008 | $1.8 Million Nominee Loan | $1,800,000 |
| 3 | FRED DAIBES and MICHAEL MCMANUS | August 6, 2008 | McManus Nominee Loan | $1,650,000 |
| 4 | FRED DAIBES | March 13, 2009 | LCII Nominee Loan | $2,625,000 |
| 5 | FRED DAIBES and MICHAEL MCMANUS | September 2009 to December 2009 | Nominee 4 Loan and 4400 Nominee Loan | $1,500,000 |
| 6 | FRED DAIBES and MICHAEL MCMANUS | September 2009 to December 2009 | Nominee 5 Loan and Boggy Creek Nominee Loan | $1,500,000 |

In violation of Title 18, United States Code, Section 656 and Section 2.

18

## Counts 7 to 13
### (Making False Entries to Deceive the Bank and the FDIC)

1.      The allegations set forth in paragraphs 1, 2, 5 and 6 of Count 1 of this Indictment are realleged and incorporated herein.

2.      In or about the dates set forth below, in Bergen County, in the District of New Jersey, and elsewhere, the defendants set forth below knowingly and intentionally made false entries in books, reports, and statements of Mariner's Bank, and did aid, abet, counsel, command, induce, procure, and cause the making of false entries in books, reports and statements of Mariner's Bank, with the intent to defraud Mariner's Bank and to deceive an officer of Mariner's Bank, the FDIC, and agents and examiners appointed to examine the affairs of Mariner's Bank:

| Count | Defendant(s) | Approximate Date | Nominee Loan | False Entries |
|---|---|---|---|---|
| 7 | FRED DAIBES | June 2008 | $1.8 Million Nominee Loan | The Mariner's Bank loan memorandum dated on or about June 11, 2008 for the $1.8 Million Nominee Loan (a) falsely stated that Nominee 1 was the borrower, when, in fact, the line of credit was for the benefit of DAIBES; and (b) falsely stated that the source of repayment would be the personal cash flow of Nominee 1 when, in fact, DAIBES would and did fund the payments on the line of credit. |
| 8 | FRED DAIBES and MICHAEL MCMANUS | August 2008 | McManus Nominee Loan | The Mariner's Bank loan memorandum dated on or about August 4, 2008 for the McManus Nominee Loan (a) falsely stated that MCMANUS, |

| Count | Defendant(s) | Approximate Date | Nominee Loan | False Entries |
|---|---|---|---|---|
| | | | | through Washington Avenue Associates, was the borrower, when, in fact, the loan was for the benefit of DAIBES; and (b) omitted the fact that DAIBES owned the collateral properties the sale of which was to be the primary source of repayment for the loan. |
| 9 | FRED DAIBES | March 2009 | LCII Nominee Loan | The Mariner's Bank loan memorandum dated on or about March 11, 2009 for the LCII Nominee Loan falsely stated that the purpose of the loan was to "purchase all existing assets and ownership interests, including subject real estate, from current owner of Liberty Commons II, LLC," when, in fact, the purpose of the loan was to benefit DAIBES and Nominee 1. |
| 10 | FRED DAIBES | September 2009 | Nominee 4 Loan | The Mariner's Bank loan memorandum dated on or about September 1, 2009 for the Nominee 4 Loan falsely stated that Nominee 4 was the borrower, when, in fact, the loan was for the benefit of DAIBES. |
| 11 | FRED DAIBES | December 2009 | 4400 Nominee Loan | The Mariner's Bank loan memorandum dated on or about December 16, 2009 for the 4400 Nominee Loan falsely stated that the rental income from the gas stations would serve as the primary source of repayment for the loan, when, in fact, DAIBES would and did |

| Count | Defendant(s) | Approximate Date | Nominee Loan | False Entries |
|-------|--------------|------------------|--------------|---------------|
| | | | | fund the repayments on the loan. |
| 12 | FRED DAIBES | September 2009 | Nominee 5 Loan | The Mariner's Bank loan memorandum dated on or about September 1, 2009 for the Nominee 5 Loan falsely stated that Nominee 5 was the borrower, when, in fact, the loan was for the benefit of DAIBES. |
| 13 | FRED DAIBES | December 2009 | Boggy Creek Nominee Loan | The Mariner's Bank loan memorandum dated on or about December 16, 2009 for the Boggy Creek Nominee Loan falsely stated that the rental income from the gas stations would serve as the primary source of repayment for the loan, when, in fact, DAIBES would and did fund the repayments on the loan. |

In violation of Title 18, United States Code, Section 1005 and Section 2.

### Count 14
**(Causing Reliance on a False Document to Influence the FDIC)**

1.      The allegations set forth in paragraphs 1, 2, 5 and 6 of Count 1 of this Indictment are realleged and incorporated herein.

2.      From in or about December 2011 to in or about March 2012, in Bergen County, in the District of New Jersey, and elsewhere, defendants

**FRED DAIBES and
MICHAEL MCMANUS**

did knowingly make and invite reliance on, and did aid, abet, counsel, command, induce, procure, and cause the making of and invitation of reliance on, a false, forged, and counterfeit statement, document and thing, namely, the Fake Contract, for the purpose of influencing in any way the action of the FDIC, namely to justify DAIBES' receipt of the proceeds of the $1.8 Million Nominee Loan.

In violation of Title 18, United States Code, Section 1007 and Section 2.

22

## Counts 15 and 16
### (Loan Application Fraud)

1.      The allegations set forth in paragraphs 1, 2, 5 and 6 of Count 1 of this Indictment are realleged and incorporated herein.

2.      On or about the dates set forth below, in Bergen County, in the District of New Jersey, and elsewhere, defendant

**MICHAEL MCMANUS**

knowingly made the following false statements for the purpose of influencing in some way the action of Mariner's Bank:

| Count | Approximate Date | Nominee Loan(s) | False Statement |
|---|---|---|---|
| 15 | August 5, 2008 | McManus Nominee Loan | MCMANUS signed a commitment letter stating that the purpose of the loan was to "refinance 3 vacant, commercial properties for a return of equity," when, in fact, MCMANUS was obtaining the loan for the benefit of DAIBES. |
| 16 | December 21, 2009 | 4400 Nominee Loan and the Boggy Creek Nominee Loan | In the False Certification, MCMANUS stated that each of the gas stations had been paid a monthly rent for at least the past 19 months and that each of the gas stations had been continuously used as a convenience store and gas station for at least the past five years, all of which were false. |

In violation of Title 18, United States Code, Section 1014 and Section 2.

## FORFEITURE ALLEGATION

1.      The allegations contained in Counts 1 through 16 of this Indictment are realleged and incorporated herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2).

2.      The United States hereby gives notice to defendants FRED DAIBES and MICHAEL MCMANUS that, upon conviction of any of the offenses charged in Counts 1 through 16 of this Indictment, the United States will seek forfeiture from the Defendants charged in each respective count, pursuant to Title 18, United States Code, Section 982(a)(2), of any property that constituted or was derived from proceeds obtained directly and indirectly by DAIBES and MCMANUS as a result of the above offenses.

3.      If by any act or omission of DAIBES or MCMANUS any of the property subject to forfeiture herein:

      a.    cannot be located upon the exercise of due diligence;
      b.    has been transferred or sold to, or deposited with, a third party;
      c.    has been placed beyond the jurisdiction of the Court;
      d.    has been substantially diminished in value; or
      e.    has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b).

A TRUE BILL



_Craig Carpenito_
CRAIG CARPENITO
United States Attorney

CASE NUMBER: 18- 655 (JLL)

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

**v.**

**FRED DAIBES and**
**MICHAEL MCMANUS**

**INDICTMENT FOR**

18 U.S.C. §§ 371, 656, 982(a)(2), 1005, 1007, 1014, and 2

A TRUE BILL,



CRAIG CARPENITO
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

RAHUL AGARWAL
SEAN M. FARRELL
*ASSISTANT U.S. ATTORNEYS*
*(973) 297-4395*
*(973) 645-6112*